IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GERALD S. LEESEBERG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 08-926-GMS |
| ) | |
| CONVERTED ORGANICS INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

## I. INTRODUCTION

On December 9, 2008, investor Gerald S. Leeseberg ("Leeseberg") filed this lawsuit against Converted Organics, Inc. ("Converted"), a company dedicated to producing natural fertilizers. In his complaint, Leeseberg sought actual damages and liquidated damages for an alleged breach of contract, conversion, unjust enrichment and breach of the implied covenant of good faith against Converted. (D.I. 1.) On October 7, 2009, the court dismissed Leeseberg's claims for conversion, unjust enrichment and breach of the implied covenant of good faith and fair dealing. (D.I. 15.) On November 22, 2010, the court denied Leeseberg's motion for class certification. (D.I. 57.) Presently before the court is Converted's motion for partial summary judgment. (D.I. 63.) For the reasons that follow, the court will deny the motion.

## II. BACKGROUND

### A. The Financing Terms Agreement

On April 11, 2006, Leeseberg purchased 101 units of Converted for $1.515 million pursuant to the Financing Terms Agreement ("FTA"). (D.I. 1 at ¶ 1.) Each unit comprised an 8% Bridge Note and a Bridge Equity Unit for the issuance of securities identical in form to the securities to be offered for sale in Converted's initial public offering ("IPO"), which was underwritten by Paulson Investment Company, Inc. ("Paulson"). (Id.) The Bridge Equity Units were restricted securities which could not be resold until they were registered under the Securities Act. (Id. at ¶ 3.) The FTA specifically set forth Leeseberg's rights:

> **Restricted Securities** . . . The *purchaser* also understands that the *Bridge Equity Units* and, with certain limited exceptions, any securities issuable on exercise or conversion thereof may not be resold by the *Purchaser* without registration under the Securities Act or an exemption therefrom, and that in the absence of an effective registration statement covering the *Bridge Equity Units* or an available exemption from registration under the Securities Act, the *Bridge Equity Units* may be restricted from resale in a transaction to which United States securities laws apply for an indefinite period of time.

(D.I. 65, ex. 1 (emphasis in original).)

Under the FTA, Converted was obligated to file a resale registration statement with the Securities and Exchange Commission ("SEC") no later than August 15, 2007, or 180 days after its IPO. (D.I. 1 at ¶ 24.) Without an effective registration, Leeseberg would not be able to resell the Bridge Equity Units. (Id. at ¶ 3.) The parties agreed to the following registration deadlines:

> [Converted] will (1) file a resale registration statement within 180 days of the *Public Offering* closing; (2) cause it to be effective within 240 days of the *Public Offering* closing if the registration statement is not reviewed by the Securities and Exchange Commission (*"SEC"*) and 270 days of the *Public Offering* closing if the registration statement is reviewed by the SEC covering the resale of the *Bridge Equity Units* and the *Document Preparation Securities* (including the resale of any shares of common stock issuable upon the exercise or conversion of

2

any ***Bridge Equity Units***); and (3) cause it to remain effective with a current prospectus available for a period of the longer of two years, or until the expiration or exercise in full of any warrants contained in the ***Bridge Equity Units***.

(D.I. 65, ex. 1 (emphasis in original).) In the event that Converted failed to timely register, Converted would be obligated to pay a 2% cash late fee to Leeseberg for each month or part thereof past the deadline to timely register:

> If [Converted] fails to satisfy requirements (1) or (2) above it will be subject to a 2% cash late registration fee (i.e. 2% of the outstanding ***Bridge Note(s)*** principal) per month or part thereof that such failure continues (***"Late Fee"***); provided such ***Late Fee*** shall not be accrued for any month after one year from the ***First Closing*** that [Converted] is current in its reporting obligations under the Exchange Act and has been subject to such reporting requirements for at least 90 days, unless any Holder is the beneficial owner of more than 1% of ***Converted Organic's*** issued and outstanding common stock, in which case the ***Late Fee*** shall continue to accrue for no more than two years from the ***First Closing***.
>
> If [***Converted***] fails to satisfy requirement (3) above, the ***Late Fee*** shall continue until the longer of the period set forth in the preceding paragraph, or the expiration or exercise in full of any warrants included in the ***Bridge Equity Units***.

(Id. (emphasis in original).)

On February 16, 2007, the $9.9 million IPO of 1.8 million units closed and Leeseberg was issued 6,364 restricted units, each unit consisting of a share of common stock, a redeemable Class A warrant and a non-redeemable Class B warrant. (D.I. 1 at ¶¶ 10, 19; D.I. 65, exs. 1, 12.) Although it was obligated to file a registration statement no later than August 15, 2007 under the terms of the FTA, Converted filed a registration statement on February 6, 2008 that was declared effective by the SEC after the market close on June 16, 2008. (D.I. 65, exs. 19, 20.)

### B. The Lock-Up Agreement

The FTA, the subscription agreements and a confidential memorandum describing the restrictions applicable to Leeseberg's securities do not mention a lock-up agreement restricting the sale of Leeseberg's securities. (D.I. 65, exs. 1, 5-7.) However, Converted's SEC filings, correspondence and deposition testimony indicate that a lock-up agreement potentially impacted Leeseberg's ability to sell the securities. A February 13, 2007 Prospectus filed with the SEC discloses:

> **Lock-Up Agreements**
>
> Our officers, directors and all stockholders (including holders of securities convertible into common stock) have agreed that for a period of one year from the date this registration statement becomes effective they will not sell, contract to sell, grant any option for the sale or otherwise dispose of any of our equity securities, or any securities convertible into or exercisable or exchangeable for our equity securities . . . without the consent of Paulson Investment Company, Inc. . . .

(Id., ex. 10 at 52.) Three additional SEC filings, including the January 24, 2008 Prospectus and the February 6, 2008 registration statement, disclose:

> **Restricted Stock, Lock-Up Agreements and Rule 144**
>
> The 1,626,962 shares of restricted stock outstanding before our initial public offering, as well as any shares issued upon the exercise of stock options may not be sold in the absence of registration under the Securities Act unless an exemption from registration is available, including the exemption from registration offered by Rule 144. The holders of these shares have agreed not to sell or otherwise dispose of any of their shares of common stock (or any securities convertible into shares of common stock) until February 16, 2007 [sic], without prior written consent of Paulson Investment Company, Inc. . . .

(Id., exs. 27, 28.)

In addition to the SEC filings, correspondence regarding the transaction suggests that the potential existence of a lock-up may have prevented Leeseberg from selling his securities. On

April 20, 2006, lead investor High Capital Funding, LLC ("High Capital") sent a letter to Leeseberg inviting him to participate in the financing and advising him that the securities "will be unregistered and most likely subject to an underwriter's lockup of up to one year." (Id., ex. 4.) On May 23, 2007, Leeseberg received a letter advising him that he was "prohibited from selling any of [his] shares of Common Stock, Class A, or Class B Warrants pursuant to an Underwriter's Lockup Agreement until February 16, 2008." (Id., ex. 16.) Moreover, High Capital sent a letter to Paulson on January 14, 2008 requesting "an early termination of the Underwriter's Lock-Up on the Bridge Securities that we had believed was in place until February 12, 2008, the one-year anniversary of the IPO effective date," noting Converted's failure to document the lock-up. (Id., ex. 21.)

In his December 1, 2010 deposition testimony, Frank Hart ("Hart"), the manager of High Capital, testified that a one-year lock up was required, and lock-ups in connection with an IPO are standard industry practice. (D.I. 73, ex. 2 at 43:16 - 45:2.) Moreover, David Rapaport testified on August 25, 2010 that he still believed a lock-up agreement existed after the discovery of its exclusion from the written documents and he would not have expected the investors to try to sell their securities during the time they understood the lock-up agreement to be in place. (Id., ex. 3 at 125:5 - 127:23.) During his August 26, 2010 deposition, Leeseberg testified that he "understood that the lock-up agreement was in place with respect to the securities" and did not believe he was permitted to sell his securities. (Id., ex. 4 at 113:22 - 118:11.)

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, determines that the Rule 56(c) standard has been met. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Boyle v. County of Allegheny*, 139 F.3d 386, 392 (3d Cir. 1998).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (nonmoving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotations omitted). A factual dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 247-48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## IV. DISCUSSION

### A. Alternative Contracts

In support of its motion for partial summary judgment, Converted presents two alternative arguments. First, Converted contends that it is entitled to summary judgment on Leeseberg's claim for actual damages because the Registration Rights provision of the FTA is an alternative contract allowing for two alternative performances by Converted. (D.I. 64 at 12.) Specifically, Converted contends that the FTA permitted it to either cause the registration of Leeseberg's securities within certain deadlines or pay a late fee for each month or part thereof past those deadlines. (Id. at 14.) By paying the late fee, Converted contends that it performed the contract and Leeseberg is not entitled to actual damages in addition to the late fee. (Id.) In response, Leeseberg contends that this court's prior decision held that the late fee is not his exclusive remedy, and the doctrine of the law of the case prohibits Converted from raising the same claim again. (D.I. 72 at 9-10.) Moreover, Leeseberg contends that the late fee is not an alternative contract because it is only applicable in the event of a breach of Converted's registration obligations. (Id. at 10-13.)

As a preliminary matter, the court concludes that the doctrine of the law of the case does not apply to Converted's argument for limiting damages to the late fee. The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it. *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994). In reviewing Converted's motion to dismiss, the court analyzed whether the late fee was a liquidated damages provision and determined that it was not. (D.I. 15.) In contrast, Converted now asks the court to determine whether the Registration Rights provision is an alternative contract, an inquiry which is separate

and distinct from the liquidated damages analysis. This new legal theory precludes Leeseberg's attempt to assert the doctrine of the law of the case.

Interpreting the Registration Rights provision as a matter of law,[1] the court concludes that Converted has failed to establish the existence of an alternative contract. "In an alternative contract, either one of two performances may be given by the promisor and received by the promisee as the agreed exchange for the return performance by the promisee. This may be so even though one of the alternative performances is the payment of a fixed sum of money . . . " *In re Cmty. Med. Ctr.*, 623 F.2d 864, 867 (3d Cir. 1980). A contract may be deemed alternative if there is a reasonable relationship between alternatives, which is determined by comparing the "relative value of the alternatives" at the time of contracting. *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 18 (Del. Ch. 2003).

The court concludes that the late fee is not an alternative for performance, but rather a consequence of nonperformance of the registration requirements. The Registration Rights provision provides only one means of performance, followed by a consequence for nonperformance:

> The Company will (1) file a resale registration statement of the *Public Offering* closing; (2) cause it to be effective within 240 days of the *Public Offering* closing if the registration statement is not reviewed by the Securities and Exchange Commission ("SEC") and 270 days of the *Public Offering* closing if the registration statement is reviewed by the SEC . . . ; and (3) cause it to remain effective with a current prospectus available for a period of the longer of two years, or until the expiration or exercise in full of any warrants contained in the *Bridge Equity Units*.

If the Company fails to satisfy requirements (1) or (2) above it will be subject to a

---

[1] In Delaware, interpretation of contract language is a question of law. *BCG, Inc. v. GleS, Inc.*, C.A. No. 07-207-GMS, 2008 WL 2856708, at *2 (D. Del. July 23, 2008).

8

> 2% cash late registration fee (i.e. 2% of the outstanding *Bridge Note(s)* principal) per month or part thereof that such failure continues ("*Late Fee*"); provided such *Late Fee* shall not be accrued for any month after one year from the *First Closing* that the Company is current in its reporting obligations under the Exchange Act and has been subject to such reporting requirements for at least 90 days, unless any Holder is the beneficial owner of more than 1% of *Converted Organics's* issued and outstanding common stock, in which case the *Late Fee* shall continue to accrue for no more than two years from the *First Closing*.
>
> If the Company fails to satisfy requirement (3) above, the *Late Fee* shall continue until the longer of the period set forth in the preceding paragraph, or expiration or exercise in full of any warrants included in the *Bridge Equity Units*.

(D.I. 65, ex. 1.) Interpreting the late fee as the sole remedy for breach would enable Converted to disregard the terms of the FTA with almost no consequences, aside from paying a late fee valued at a fraction of Leeseberg's alleged actual damages. The language of the Registration Rights provision does not support such a result. Because the court concludes that the Registration Rights provision cannot be interpreted to provide two alternative modes of performance, the court need not reach the issue of whether the value of the late fee was approximately equal to the value of the actual damages at the time of the contract.

### B. Calculation of Actual Damages

In the alternative, Converted contends that the FTA's deadline for registration of Leeseberg's warrants, November 13, 2007, should constitute the beginning of the restricted period used to measure damages for delays in registering securities. (D.I. 64 at 15.) Converted contends that the court should exclude evidence regarding the existence of a lock-up agreement because Leeseberg failed to disclose his contentions regarding the lock-up in his initial disclosures and discovery responses. (Id. at 16.) Moreover, Converted contends that no admissible evidence exists of an agreement by Leeseberg to subject his warrants to a lock-up.

9

(Id. at 17-20.) In response, Leeseberg contends that Converted's motion to determine when the restricted period begins would not dispose of Leeseberg's claim and therefore summary judgment is inappropriate. (D.I. 72 at 14-15.) Moreover, Leeseberg contends that Converted's SEC filings, pre-litigation correspondence and deposition testimony provide overwhelming evidence that Leeseberg's securities were subject to a lock-up. (Id. at 16-18.)

As a preliminary matter, the court concludes that evidence of the lock-up agreement is admissible. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to support evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts within the Third Circuit evaluate harmlessness and substantial justification based on the following factors: (1) the importance of the information withheld; (2) the prejudice or surprise to the party against whom the evidence is offered; (3) the likelihood of disruption of the trial; (4) the possibility of curing the prejudice; (5) the explanation for the failure to disclose; and (6) the presence of bad faith or willfulness in not disclosing the evidence. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997). "[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977), *rev'd on other grounds, Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656, 107 S. Ct. 2617, 96 L. Ed. 2d 572 (1987). The determination of whether to exclude evidence is committed to the discretion of the court. *Quinn v. Consol. Freightways Corp. of Del.*, 283 F.3d 572, 576 (3d Cir. 2002).

Having considered the record and the relevant factors, the court concludes that the extreme sanction of precluding Leeseberg from relying on evidence of a lock-up agreement is not warranted. The applicability of the lock-up is critical to Leeseberg's argument regarding actual damages, and the court is not persuaded that Converted is unduly prejudiced by the timing or substance of this evidence. Leeseberg disclosed the February 13, 2007 Prospectus on which it relies in its amended initial disclosures (D.I. 21) and produced correspondence regarding the existence of a lock-up in response to Converted's document requests (D.I. 34). Leeseberg produced the January 24, 2008 amendment to the registration statement and the January 28, 2008 Prospectus in response to Converted's document requests and interrogatories regarding the lock-up. (D.I. 58.) Deponents David Rapaport, Frank Hart and Leeseberg were also questioned about the lock-up during their depositions. Converted has failed to demonstrate that Leeseberg acted in flagrant disregard of a court order or with willful deception. Accordingly, the court will allow evidence of the purported lock-up agreement. Moreover, the court concludes that the evidence presented by Leeseberg is not barred by the parol evidence rule because nothing in the FTA prohibits additional restrictions from being placed upon the securities.

The court concludes that genuine issues of material fact remain regarding the impact of the lock-up agreement on the alienability of Leeseberg's securities, precluding the entry of summary judgment in favor of Converted. Specifically, Leeseberg cites to SEC filings, correspondence and deposition testimony in support of his argument that he believed his securities were subject to the lock-up, while Converted points to conflicting evidence in the language of the FTA, the subscription agreements and a confidential memorandum. Therefore, the court shall deny Converted's motion for partial summary judgment with respect to the

measure of Leeseberg's actual damages.

## V. CONCLUSION

For the reasons stated above, Converted's motion for partial summary judgment (D.I. 63) is denied. An appropriate order shall issue.

Dated: March 3, 2011

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GERALD S. LEESEBERG, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONVERTED ORGANICS INC.,<br><br>Defendant. | C.A. No. 08-926-GMS |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that Leeseberg's motion for partial summary judgment (D.I. 63) is DENIED.

Dated: March 3, 2011

CHIEF, UNITED STATES DISTRICT JUDGE